IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CYNTHIA E.L. OSBORNE,**          Case Number 1:13cv1574

      Plaintiff,

      v.          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.          MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Cynthia E.L. Osborne seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on June 18, 2010[1], alleging disability since March 30, 2008, due to attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, "dry cuts on feet condition", depression, anxiety, and panic attacks. (Tr. 12, 207, 372). Her claims were denied initially and on reconsideration. (Tr. 84-87). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 8). At the hearing, Plaintiff, represented by counsel,

---

1. In a footnote, Plaintiff says that despite her request for the reopening of a previous application, the ALJ did not mention the prior applications. (Doc. 17, at 3, note 1). However, Plaintiff does not claim this is reversible error.

Plaintiff's mother, and a vocational expert ("VE") testified. (Tr. 37). On March 30, 2012, the ALJ concluded Plaintiff was not disabled. (Tr. 9). Plaintiff's request for review was denied, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On July 22, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### *Plaintiff's Background, Vocational Experience, and Daily Activities*

Born April 5, 1986, Plaintiff was 21 years old at the time of her alleged disability onset date. (Tr. 24). She has a tenth-grade education and past relevant work experience as a seat assembler, electrical accessory assembler, and cook helper. (Tr. 24, 224). Plaintiff was enrolled in special education classes, held back twice, and tried to obtain a GED but "failed". (Tr. 43, 59-60, 433-60, 672).

Plaintiff lived in an apartment with her two children, who were four and seven at the time of the ALJ hearing. (Tr. 42). She was able to drive but lost her license for not carrying insurance. (Tr. 42-43). Concerning daily activities, Plaintiff maintained personal care, cooked, washed dishes, vacuumed, took care of her children with some assistance from her mother, helped with her seven-year-old child's homework, paid bills, visited family, and watched television. (Tr. 54-56, 58-59). Plaintiff's mother assisted with grocery shopping and laundry because Plaintiff did not have a washer or dryer. (Tr. 53-55). Plaintiff testified she participated in parent-teacher conferences via telephone and did not go to movies, restaurants, or church because crowds caused panic attacks. (Tr. 55-56).

*Medical Evidence*

In high school, Plaintiff passed all Ohio ninth-grade proficiency tests. (Tr. 225, 230). At age sixteen, Plaintiff generally scored "very low" on cognitive testing and was placed under an Individualized Education Plan ("IEP"). (Tr. 251, 437). She took special education classes for less than 21% of the time. (Tr. 438). Plaintiff's special education teacher evaluated her social and emotional status and adaptive behaviors, and indicated Plaintiff functioned normally in all observed areas, although she did not participate in extra-curricular activities. (Tr. 222-33). The teacher commented Plaintiff was "very outgoing" and interacted with and helped her peers. (Tr. 232-33). In eleventh grade, Plaintiff had over 84 absences, failed her classes "due to attendance", and withdrew from high school. (Tr. 224-28).

On September 26, 2003, Nicomedes M. Sansait, M.D., performed a psychiatric evaluation focused on Plaintiff's depression. (Tr. 479). He indicated Plaintiff currently worked babysitting and for McDonald's. (Tr. 480). Noting Plaintiff's behavior problems, including physical fights with her boyfriend, Dr. Sansait assessed Plaintiff with possible mood disorder, depressed mood, and significant history of ADHD and behavioral problems; assigned a global assessment of functioning ("GAF") score of 62[2]; prescribed medication; and recommended Plaintiff continue counseling. (Tr. 479-81).

Plaintiff presented to Brenda Perryman, M.D., on September 25, 2008, complaining of anxiety, sleeplessness, frequent anger, frequent crying spells, and experiencing several thoughts at once. (Tr. 604). Plaintiff smoked one pack of cigarettes per day. (Tr. 604). Dr. Perryman

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF of 61-70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

assessed obesity and history of bipolar disorder, anxiety, and ADHD; referred her to a psychologist; and recommended smoking cessation. (Tr. 604).

On October 20, 2008, Plaintiff went to Community Counseling Services with many of the same complaints. (Tr. 471-74). She was diagnosed with major depressive disorder and although she was recommended for individual counseling, she did not complete the intake paperwork, never returned for treatment, and was discharged. (Tr. 469-70, 474-76).

Plaintiff treated with Fereshte Khavari, M.D., on March 25, 2009. (Tr. 586). Plaintiff complained of pelvic pain, cough, bipolar disorder, anxiety, depression, panic attacks, and cracked feet. (Tr. 586). A month later, Dr. Khavari noted Plaintiff's pelvic pain and foot condition improved but she still coughed and suffered from anxiety, sleeplessness, mood swings, racing thoughts, poor concentration, and forgetfulness. (Tr. 587-88). Dr. Khavari adjusted Plaintiff's medications. (Tr. 588-90).

In May and June of 2009, Dr. Khavari indicated Plaintiff's pelvic pain subsided, she was able to exercise and do yard work, and was watching her diet. (Tr. 584-85). Thanks to medication, Plaintiff had more energy; a better, more stable mood; improved sleep; fewer racing thoughts; and less anxiety attacks. (Tr. 582, 584). However, she continued to feel depressed. (Tr. 582). Generally, Plaintiff reported improved symptoms to Dr. Khavari on January 25, 2010, February 22, 2010, and April 19, 2010, except on January 25, 2010, Plaintiff complained of rambling thoughts. (Tr. 579, 581, 649).

On July 15, 2009, following a referral to parenting class by Children Services over concerns of physical abuse toward her son, Barbara A. Wirebaugh, LISW-S, MSW assessed Plaintiff's mental health. (Tr. 557). Plaintiff said she was in a romantic relationship, denied history of drug or alcohol abuse, had a diagnosis of bipolar disorder, and admitted to a history of

4

legal problems stemming from poor anger control. (Tr. 557). She complained of diminished appetite, frequent headaches, depression, shakiness, panic attacks, claustrophobia, social anxiety, short attention span, poor memory, racing thoughts, impulsive behavior, paranoia, and moodiness. (Tr. 557). Ms. Wirebaugh recommended Plaintiff continue medsomatic treatment to control symptoms of bipolar disorder and suggested individual counseling and supportive parent coaching. (Tr. 558).

Plaintiff had several follow-up visits with Ms. Wirebaugh until March 31, 2010. (Tr. 540-58). During these visits, Plaintiff was upset over being turned away from emergency services and a pending Children Services case; admitted to drug and alcohol abuse in the past twelve months; expressed resentment toward her mother and abusive stepfather; and complained of occasional visual hallucinations, racing thoughts, irritability, anxiousness, restlessness, and trouble concentrating. (Tr. 540-41, 544-45, 547-50, 555-56). Plaintiff was cooperative and motivated to resolving her mental health problems. (Tr. 541, 548-49, 554-55). Ms. Wirebaugh discussed Plaintiff's family history and counseled her on parenting strategies and ways to reduce her symptoms. (Tr. 547-50, 553-56).

On March 6, 2010, Plaintiff went to the emergency room in "obvious manic stage", talking nonstop, pacing the room, complaining about her son, and alleging a nervous breakdown. (Tr. 527-28). She had cracks on her feet and an otherwise unremarkable physical examination. (Tr. 529). Plaintiff denied suicidal thoughts, spoke with a counselor, and was discharged. (Tr. 527-28). On March 26, 2010, Plaintiff returned to the emergency room saying she was "pissed" for not being hospitalized by Community Counseling and described herself as psychiatrically ill. (Tr. 524). The treating physician indicated Plaintiff was well-developed and did not appear toxic or "emergently ill." (Tr. 525). Like the previous visit, Plaintiff tested positive for amphetamines,

cannabinoids, and opiates. (Tr. 525, 529). After being questioned by a counselor, Plaintiff was discharged with plans to participate in outpatient therapy. (Tr. 524-25).

In April of 2010, Plaintiff lost eleven pounds (possibly due to giving up Pepsi and sweets) and complained to Dr. Khavari of extreme panic attacks, hot and cold spells, anxiousness, increased stress at home, and shaking hands. (Tr. 656). On April 29, 2010, Plaintiff complained of cracking feet and was given a steroidal cream. (Tr. 647). On August 25, 2010, Plaintiff told Dr. Khavari she stopped taking all medication except Flonase and Seroquel, but she wanted to resume taking Adderall, Xanax, Lamictal, and Celexa. (Tr. 569).

Ms. Wirebaugh completed a medical report on August 24, 2010, where she indicated Plaintiff had racing thoughts, flight of ideas, tangential thought processes, agitation, irritability, reactivity, impulsivity, obsessing, poor concentration, anxiety, depression, low-average intelligence, poor frustration tolerance during manic episodes, very poor stress tolerance, paranoia, and distrust of strangers. (Tr. 537-38). She added Plaintiff was goal-oriented but inconsistently followed-through. (Tr. 537). Ms. Wirebaugh said Plaintiff would perform best in activities that did not require interaction with the public or adherence to a regular schedule. (Tr. 537). She reported Plaintiff suffered manic episodes that debilitated functioning and cycled every few days or weeks and said Plaintiff was resistant to psychotherapy due to cognitive limitations. (Tr. 537).

On August 25, 2010, M. Blackborn, MSN-CNP, completed a medical source statement indicating Plaintiff had a depressed mood and manic periods with irrational thoughts at times, but her mood, daily activities, self-care, and social interaction were stabilized with medication. (Tr. 567). Nurse Blackborn said Plaintiff's symptoms persisted her "whole life", but they had improved and Plaintiff could deal with "everyday normal stressors of life". (Tr. 568). She also

indicated Plaintiff was not compliant with medication because she did not like the side effects and could become violent. (Tr. 568).

On November 8, 2010, Dr. Khavari assessed Plaintiff's medical and mental functional capacity for the Crawford County Department of Job & Family Services, stating that Plaintiff's bipolar disorder caused mood swings and difficulty concentrating and she needed to be stabilized on medication before she could enroll in a work program. (Tr. 615). Dr. Khavari expected Plaintiff's severe limitations to last one-to-three months. (Tr. 615).

Plaintiff had about six follow-up visits with Dr. Khavari from August 30, 2010 through September 29, 2011. (Tr. 631-40, 680-86). Generally, she complained of mild to moderate depression, disturbed sleep patterns, anxiousness, crying spells, sadness, fatigue, mood swings, and difficulty concentrating. (Tr. 631, 633, 636, 640, 680, 683, 686). Occasionally she complained of urinary urgency, frequent hunger, shakiness, palpitations, tachycardia, and trouble walking. (Tr. 631, 683, 686). The regularity of her symptoms varied from frequent to sporadic or nonexistent. (Tr. 636, 680, 683, 686). Dr. Khavari routinely managed Plaintiff's medication regimen. (Tr. 631-40, 680-86). Related to her dry, cracked feet, Plaintiff consistently rated her pain at a zero out of ten (Tr. 636, 680, 686), except for on September 12, 2011, when she rated the pain at an eight (Tr. 683). On March 18, 2011, Dr. Khavari noted Plaintiff was walking for 45 minutes twice a day. (Tr. 633). Near the end of treatment, Plaintiff was noncompliant with her medication regimen. (Tr. 685, 686).

On February 25, 2011, Dr. Khavari completed a medical source statement where he indicated Plaintiff's cognitive limitations or symptoms allowed her to perform tasks with detailed but uninvolved instructions; she could stay on task for 66-84% of the time due to frequent anxiety attacks, generalized anxiety, and difficulty with concentration; she could be expected to

be 15-25% less productive than an unimpaired worker due to mood swings, anxiety, and difficulty with concentration; and would be absent, late, or leave early 5-15% of the time due to an inability to concentrate, mood swings, and depression accompanied by fatigue. (Tr. 627-28). Plaintiff could engage in occasional superficial social interactions, could not work with the public, would occasionally be distracted by coworkers, required a supportive work environment, and would have emotional blowups or outbursts four or six times per year. (Tr. 629). Dr. Khavari cautioned that any job requiring precision would likely exacerbate Plaintiff's symptoms. (Tr. 629). Dr. Khavari indicated Plaintiff suffered from several episodes of mania during the past two years, which disrupted her relationships and ability to interact with others. (Tr. 629).

Plaintiff presented to G. Scott Drew, D.O., on December 12, 2012 alleging problems with her feet that were worse in the winter and better in the summer. (Tr. 697-99). Dr. Drew diagnosed hyperkeratotic plantar keratoderma, prescribed Lac-Hydrin and Salex, and noted she may require systemic therapy. (Tr. 697).

### State Agency Opinion Evidence

On July 3, 2009, consultative examiner James F. Sunbury, Ph.D., ABPP, examined Plaintiff and opined on her mental functioning. (Tr. 497). Plaintiff discussed with Dr. Sunbury a tumultuous childhood, inability to earn her GED, and issues with Children Services. (Tr. 498). She said she was recently laid off as part of a general lay off, typically had good relationships with coworkers and supervisors, and eventually got the hang of job tasks after several demonstrations. (Tr. 498). Plaintiff said she was under medication management with her personal physician and had dry skin on her feet, which was sometimes painful. (Tr. 498). Plaintiff's appearance, flow of conversation, and thought, affect, and mood were unremarkable. (Tr. 499). Plaintiff recounted suffering a "mental breakdown" when her children were removed

8

from her care but said she had since recovered. (Tr. 499). Dr. Sunbury evaluated Plaintiff's insight and judgment as low-average and noted she maintained the house, mowed the lawn, visited with her children, and with assistance from her boyfriend, paid bills, did laundry, washed dishes, and cooked. (Tr. 500). Dr. Sunbury assigned Plaintiff a valid full scale IQ of 71, in the borderline range of general intellectual functioning, and diagnosed Plaintiff with bipolar disorder, panic disorder without agoraphobia, and borderline intellectual functioning. (Tr. 500). He concluded Plaintiff was unimpaired in her ability to relate to others and maintain attention, concentration, persistence, and pace to perform routine tasks and she was mildly impaired in her ability to understand, remember, and follow instructions and withstand the stress and pressures associated with day-to-day work activity. (Tr. 501).

On July 27, 2009, state agency review physician Irma Johnston, Psy.D., completed a psychiatric review technique and mental residual functional capacity ("RFC") assessment. (Tr. 505-22). She found Plaintiff's bipolar disorder, borderline intellectual functioning, and panic disorder caused a mild limitation in activities of daily living and moderate limitation in maintaining social functioning, concentration, persistence, and pace. (Tr. 508-10, 515). According to Dr. Johnston, Plaintiff was, at most, moderately limited in all areas of mental functioning. (Tr. 519-20). She concluded Plaintiff retained the mental capacity for simple, repetitive tasks in a low-stress, non-public setting without strict production demands. (Tr. 521).

Consultative examiner Orin L. Hall, M.D., evaluated Plaintiff's physical RFC on May 25, 2011. (Tr. 663-66). Plaintiff's physical examination was generally unremarkable aside from significant fissuring at the plantar surface of both feet without discharge, bleeding, or signs of infection. (Tr. 663-66). Dr. Hall determined Plaintiff would be capable of medium work except she would have difficulty walking over uneven surfaces, walking more than 100 feet, and

standing for longer than five minutes. (Tr. 666).

On June 14, 2011, state agency review physician Gerald Klyop, M.D., completed a physical RFC assessment (Tr. 124-26). Dr. Klyop found Plaintiff was capable of a range of medium work. (Tr. 124-26, 129-30).

Consultative examiner Donald H. McIntire, Ph.D., evaluated Plaintiff on July 27, 2011. (Tr. 671-78). He noted Plaintiff's violent childhood and that she was currently single because her daughter's father was abusive to her and her child. (Tr. 672). She was held back twice in school, dropped out after the tenth grade, and has tried but failed to get her GED. (Tr. 672). While on medication, Plaintiff got along well with her children but suffered from anxiousness, especially when someone was behind her or watching her work, using public transportation, walking alone in her neighborhood, and eating alone in a restaurant. (Tr. 672-73). Plaintiff suffered from psoriasis on her feet, which she currently treated with lotions under the care of Dr. Khavari; however, Plaintiff planned to see a dermatologist in the future. (Tr. 673). Dr. McIntire noted the longest Plaintiff worked was for one year in an on-again, off-again situation and she had trouble keeping up with the work requirements, learning new jobs, concentrating on work, adjusting to changes in work requirements, accepting criticism, and getting along with others. (Tr. 673). Dr. McIntire highlighted Plaintiff's reported symptoms, including anxiety, depression, crying spells, self-deprecating thoughts and actions, manic episodes, explosive temper, violent behavior, sleeplessness, flashbacks, intrusive memories, and generally borderline intellectual functioning. (Tr. 674-75). By way of daily activities, Dr. McIntire relayed that Plaintiff took care of her children, cleaned, watched television, completed basic tasks on a computer, did laundry but did not sort the clothing, vacuumed, cooked basic meals, and read simple newspapers and magazines but did not shop independently, play card or board games, or manage her own finances. (Tr.

676). Dr. McIntire assigned a GAF score of 50[3], valid full-scale IQ of 68, and indicated she would have at least some difficulty in all four areas of work-related mental abilities. (Tr. 678-79).

On August 10, 2011, state agency review physician Aracelis Rivera, Psy.D., conducted a psychiatric review technique and mental RFC assessment. (Tr. 123-24, 127-28). Dr. Rivera concluded Plaintiff could complete simple routine tasks in a slow-paced environment where contact with others was only occasional and superficial. (Tr. 128).

***ALJ Decision***

The ALJ determined Plaintiff suffered from severe impairments of post-traumatic stress disorder, panic disorder with agoraphobia, bipolar II disorder, anxiety disorder, and borderline intellectual functioning. (Tr. 14). Next, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (Tr. 15). The ALJ found Plaintiff had the RFC to perform a range of medium work, except she could occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop, knee, crouch, crawl, and climb ramps and stairs; and was limited to simple, repetitive, and routine tasks in a slow-paced environment with only occasional, superficial contact with others. (Tr. 17).

Considering Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ determined Plaintiff could work in cleaner, self-service laundry, and drying oven attendant positions. (Tr. 24-25). Thus, the ALJ determined Plaintiff was not disabled. (Tr. 25).

#### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

---

3. A GAF score of 41-50 reflects serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *DSM-IV-TR* at 34.

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 and § 416.920 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4.  What is claimant's RFC and can she perform past relevant work?

5.  Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ: 1) did not properly consider Plaintiff's symptoms in light of listing 12.05(C) – intellectual disability; 2) did not provide good reasons for the weight assigned to the opinions of consultative examiners Drs. McIntire and Hall; 3) failed to address and consider the statements of Ms. Wirebaugh in violation of Social Security Ruling ("SSR") 06-03p; 4) had no basis for discounting opinions based on a presumption of sympathy or reliance on Plaintiff's subjective complaints; 5) improperly omitted limitations for standing and walking; and 6) improperly relied on VE testimony that conflicted with the DOT, hypothetical, and/or nonexistent jobs. (Doc. 17). In support of her last argument, Plaintiff submitted relevant DOT descriptions. (Docs. 17-1, 17-2, 17-3). Each argument is addressed in turn.

***Listing 12.05(C)***

First, Plaintiff claims the ALJ's "evaluation of listing 12.05C misstates material facts and is not supported by substantial evidence." (Doc. 17, at 17). In response, the Commissioner contends the ALJ's finding is supported by substantial evidence. (Doc. 18, at 13).

A claimant can demonstrate she is disabled by presenting "medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). To demonstrate intellectual disability, formerly termed mental retardation, a claimant must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05(C) requires that a claimant have a valid, verbal, performance, or full scale I.Q. of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his

14

decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

Here, the ALJ found Plaintiff did not meet or medically equal listing 12.05(C) for two reasons: 1) Plaintiff had a valid full scale IQ score of 68, however, her other impairments did not impose significant work related limitations of function; and 2) there was no evidence of adaptive functioning limitations prior to age 22. (Tr. 17). In support, the ALJ reasoned Plaintiff received special education services since a young age; has a substantial work record as a factory worker, laundry worker, and cook; did not appear to require special accommodations in her prior work; and despite borderline intelligence, was able to reside independently with and raise her two children. (Tr. 17).

The Commissioner reasonably concedes that the ALJ's finding of one or more severe impairments at step two is sufficient to satisfy the significant limitation requirement of 12.05(C). (Doc. 18, at 14); *see*, *Switzer v. Colvin*, 2014 U.S. Dist. LEXIS 79541, at *24 (N.D. Ohio) (discussing 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00(A) and 20 C.F.R. §§ 404.1520(C), 416.920(C)). But this does not end the inquiry. Rather, Plaintiff must still satisfy the diagnostic criteria of listing 12.05, including evidence of limitation in adaptive skills prior to age 22.

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) (citing *Heller v. Doe*, 509 U.S. 312, 329 (1993)). The Sixth Circuit has relied on the American Psychiatric Association to list adaptive-skills limitations as "[c]oncurrent deficits or impairments ... in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction,

functional academic skills, work, leisure, health, and safety." *Hayes*, 357 F. App'x at 677 (quoting *DSM–IV–TR* at 49).

Plaintiff argues that in light of record evidence, the diagnostic criteria of listing 12.05 are met. (Doc. 17, at 18-20). In support, Plaintiff identifies purported evidence of adaptive skills limitations in several areas. (Doc. 17, at 5-9; Doc. 19, at 3). However, because the Court must affirm the ALJ's decision even where evidence exists to support a contrary conclusion, the Court finds the ALJ's determination that Plaintiff does not meet or equal listing 12.05(C) supported by substantial evidence.

Regarding social/interpersonal skills and safety, Plaintiff directs to Court to evidence that she was teased and had trouble socializing as a child; had legal charges of unruliness, menacing, and domestic violence; and was issued a temporary protection order against her boyfriend – all before age 22. (Doc. 17, at 6, 9). However, as the ALJ found, Plaintiff was able to socialize with her family and friends, shop in the community, and reside independently with her two children. (Tr. 16, 54-56, 58-59, 676). The ALJ also pointed out Plaintiff's conflicting reports of ability to get along with coworkers. (Tr. 18, 21, 498, 629). Moreover, school records indicated Plaintiff was outgoing and helpful to classmates. (Tr. 19, 232-33). As the ALJ identified, Plaintiff babysat, was described as cooperative, and participated in parent-teacher conferences. (Tr. 19, 55-56, 232-33, 480). What is more, according to Plaintiff's mother, she had a good support system comprised of family and friends. (Tr. 19, 70).

Turning to functional academic skills, Plaintiff argues she was in special education classes; had delays in ability, achievement, and adaptive behavior; and struggled with comprehension. (Doc. 17, at 7). However, it is well-settled that poor academic performance, in and of itself, is not sufficient to warrant a finding of subaverage intellectual functioning before

the age of 22. *Hayes*, 357 F. App'x at 677. As the ALJ noted, Plaintiff was able to pass her state proficiency tests and accrued an abundance of absences before dropping out of school. (Tr. 19, 224-28, 230). Moreover, there is evidence in the record which demonstrates Plaintiff functioned at borderline intellectual range, not at the mentally retarded level. (Tr. 17, 251, 437, 500, 509, 675).

With respect to work activity, Plaintiff claimed she needed extra help at work, would mix up numbers, did not reach substantial gainful employment, and was let go from her job as cleaner because she could not do the work. (Doc. 17, at 8). But, as the ALJ noted, Plaintiff babysat and worked at McDonald's during her junior year of high school, was let go from her position in summer of 2008 as part of a general layoff, and averred she generally got along with coworkers and could catch on to job-related tasks. (Tr. 19, 21, 480, 498). Moreover, aside from her own statement, there is no evidence to support finding Plaintiff worked with accommodations. (Tr. 17).

Last, concerning self-direction, Plaintiff identified a psychological report completed when she was seven-years-old that said she required one-on-one support. (Doc. 17, at 7). However, as the ALJ noted, Plaintiff held employment, was described as helpful and outgoing, and maintained a home for herself and her two young children, albeit with some outside assistance. (Tr. 17, 19, 53-56, 58-59, 232-33, 676).

Therefore, despite the ALJ's erroneous finding that Plaintiff's other impairments did not constitute a significant limitation, substantial evidence nevertheless supports her determination that Plaintiff does not meet or medically equal the diagnostic criteria of listing 12.05(C). Therefore, the ALJ's decision is affirmed.

***Treating Physician Rule***

Next, Plaintiff challenges the ALJ's treatment of various opinion evidence of record. (Doc. 17, at 20-22). These arguments implicate the well-known treating physician rule.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship,

the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502; 416.902. A medical provider is *not* considered a treating source if the claimant's relationship with him or her is based solely on the claimant's need to obtain a report in support of their claim for disability. §§ 404.1502; 416.902 (emphasis added). Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. §§ 404.1502; 416.902. This includes a consultative examiner. §§ 404.1502; 416.902.

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. §§ 404.1502; 416.902. This includes state agency physicians and psychologists. §§ 404.1502; 416.902. The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. §§ 404.1527(e)(2)(ii); 416.927.

Consultative Examiners Drs. McIntire and Hall

Plaintiff argues the ALJ did not provide good reasons for giving only some weight to consultative examiner Dr. McIntire's "unusually thorough" report. (Doc. 17, at 20). Similarly, Plaintiff argues the ALJ erred by affording some weight to the opinion of consultative examiner

Dr. Hall. *Id*. In support, Plaintiff accuses the ALJ of engaging in "unsupported speculation" when she found the examiners relied on Plaintiff's subjective complaints. *Id*.

Here, the ALJ assigned some weight to the opinions except she did not afford weight to "Dr. McIntire's more inconsistent extreme statements regarding [Plaintiff]'s ability to cope with criticism and speeded conditions" and "Dr. Hall's conclusions regarding walking and standing limitations." (Tr. 23). The ALJ concluded these findings were "based upon [Plaintiff's] subjective report as opposed to objective evidence." (Tr. 23).

As consultative examiners, Drs. McIntire and Hall are non-treating sources. 20 C.F.R. §§ 404.1502; 416.902. Nevertheless, "[o]pinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, at 823-24 (S.D. Ohio 2011). In terms of her regulatory obligations, the ALJ commented on the supportability of the opinions. § 404.1527(d)(2). While brief, this finding was not "unsupported speculation." (Doc. 17, at 20); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (an ALJ's reasons for discounting a treating physician may be brief).

Indeed, while Dr. Hall observed fissures on Plaintiff's feet, Plaintiff's physical examination was generally unremarkable. (Tr. 663-66). Further, the fissures were without discharge, bleeding, or signs of infection. *Id*. Simply, Dr. Hall's finding that Plaintiff was capable of medium work, yet could not walk more than 100 feet or stand longer than five minutes is contrary to his examination and not supported by Dr. Hall's opinion. (Tr. 666). Similarly, Dr. McIntire conducted a mental status examination, noting Plaintiff "had no difficulties in comprehending questions or expressing herself", "presented with a normal range of emotions", had "no difficulties with long-term memory", "was oriented to person, place, time,

and purpose of the evaluation", exhibited "good perseverance" on difficult tasks, and tested between the intellectually disabled and mild mentally retarded levels. (Tr. 674-76). However, in his opinion, Dr. McIntire recounted Plaintiff's subjective complaints and self-described symptoms, including irritability, variable mood, anxiousness, and poor short-term memory. (Tr. 674-75).

In short, both examinations were inconsistent with the examiners' extreme findings. In her decision, the ALJ comprehensively considered the objective evidence; although she could have been more explicit when discussing the consultative examiners' opinions, she met her regulatory obligations by commenting as to the supportability of the one-time examiners' opinions and therefore, Plaintiff's argument is not well-taken.

<u>Ms. Wirebaugh</u>

Plaintiff claims the ALJ failed to address, consider, or acknowledge the statements of Ms. Wirebaugh (of Affinity Health Works) in violation of SSR 06-03p. (Doc. 17, at 20-21). Plaintiff also claims the ALJ is "required" by SSR 06-3p to weigh Ms. Wirebaugh's opinion under the same factors applied to acceptable medical sources but failed to do so. (Doc. 19, at 8). However, as discussed below, the ALJ adequately considered Ms. Wirebaugh's treatment records.

Ms. Wirebaugh, a social worker, is classified as an "other source" under the regulations. 20 C.F.R. § 404.1513(d)(1); *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011). The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in §§ 404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9,

21

2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p.

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

Further, the ALJ clearly considered Ms. Wirebaugh's treatment notes, indicating Plaintiff sought counseling from Affinity Health Works (i.e., Ms. Wirebaugh) nine times for bipolar I and posttraumatic stress disorder between July of 2009 and March of 2010. (Tr. 20, *referring to*, Tr. 537-58). Moreover, the ALJ noted Plaintiff's complaints to Ms. Wirebaugh of mania and racing thoughts as well as overlapping emergency room treatment. *Id.*

Indeed, the ALJ considered Ms. Wirebaugh's treatment records "on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3. For example, the ALJ used Ms. Wirebaugh's statements to support his finding that Plaintiff's mental symptoms were "adequately medical controlled", were "well accommodated by a restriction to medium exertional level simple tasks", and amounted to a "sparse conservative medical and

psychological treatment" history indicating Plaintiff's symptoms "are not as disabling as purported." (Tr. 22). The ALJ considered the fact Ms. Wirebaugh only saw Plaintiff nine times throughout the entire treatment record. (Tr. 20). The ALJ commented on the fact that although Plaintiff went to the hospital twice during the time she treated with Ms. Wirebaugh, she apparently exaggerated symptoms, tested positive for marijuana, amphetamines, and opiates, and stopped taking her medication. (Tr. 20). In support, the ALJ noted, among other things, that Plaintiff went nine months between treatment and was only seen on twelve occasions in an eight month period before discontinuing care. (Tr. 22). Although he did not assign her opinion weight, the ALJ adequately considered Ms. Wirebaugh's statements.

To the extent Plaintiff argues the ALJ was required to address *each* of Ms. Wirebaugh's statements, that argument is not well-taken because the ALJ is under no obligation to discuss each piece of evidence from the record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each . . . opinion, it is well settled that 'an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.'") (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *see also*, *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 842 (6th Cir. 2005) (ALJ did not err by failing to discuss third party statement because he discussed objective evidence at length).

<u>Consideration of Sympathy and Subjective Complaints</u>

Next, Plaintiff argues the ALJ had no basis for discounting opinions based on a presumption of sympathy or reliance on Plaintiff's subjective complaints in order to discount the opinions of Dr. Khavari, Plaintiff's mother, and consultative examiners Drs. Hall and McIntire. (Doc. 17, at 21-22). Plaintiff maintains summarily there is "no basis" for these "presumptions"

23

and argues Plaintiff did not receive a fair reading of the evidence based on a "pattern of dismissing treating physicians and family members because they may be sympathetic to the claimant". (Doc. 17, at 22); (Doc. 19, at 9).

In essence, Plaintiff asks the Court to find the ALJ's consideration of sympathy and Plaintiff's subjective complaints to discount various opinions improper, yet cites no legal authority in support. The undersigned declines to subscribe to this statement where law to the contrary exists (as described below). What is more, aside from the consultative examiners, addressed above, Plaintiff does not claim the ALJ failed to provide good reasons for discrediting the opinions of Plaintiff's mom and Dr. Khavari, and rightly so.

To this end, in addition to questioning the sympathy for the Plaintiff and basis on subjective complaints, the ALJ afforded Dr. Khavari's opinion little weight because it opined on an issue reserved to the Commissioner (that Plaintiff was unemployable), was not supported by treatment records noting improvement with medication compliance and generally unremarkable mental status examinations, was made without the benefit of reviewing other medical evidence in the record, was inconsistent with the medical record, and was offered in an area of medicine removed from Dr. Khavari's specialty of general family practice. (Tr. 22-23). Simply stated, the ALJ provided good reasons to discount Dr. Khavari's opinion by addressing regulatory factors including nature of treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. 20 C.F.R. § 404.1527(d)(2)).

Similarly, the ALJ properly considered Plaintiff's mother's testimony and as an "other source", the opinions of Plaintiff's mother are not entitled to controlling weight. *Cruse*, 502 F.3d at 541. The ALJ needed only to consider Plaintiff's mother's statements, which she certainly did.

(Tr. 19). To this end, the ALJ acknowledged that the testimony corroborated Plaintiff's statements to some degree, but she could not ignore "the close relationship" between Plaintiff and her mother and the "possibility that the testimony was influenced in favor of the claimant by a desire to help the claimant". (Tr. 19). Consideration of such evidence is reasonable, and not prohibited by the regulations or the law within the Sixth Circuit; in fact, persuasive law exists to the contrary. *See, e.g., Calliet v. Astrue*, 2012 WL 4120383, at *10 (N.D. Ohio) ("While an explanation based upon the evidence in the record would have been preferable, the ALJ did not err in his consideration of the third party statement of [claimant's] mother) (citing *McClanahan v. Comm'r of Soc. Sec.,* 2011 U.S. Dist. LEXIS 15599 at *38, (S.D. Ohio) (finding no impropriety in the ALJ's rejection of the testimony of claimant's live-in girlfriend on the basis that she was not an impartial witnesses) and *Moore v. Comm'r of Soc. Sec.,* 2010 U.S. Dist. LEXIS 59080 (S.D. Ohio) (affirming decision where the record did not corroborate the testimony of lay witnesses who were not impartial and who relied on plaintiff's subjective allegations for their opinions)); *see also*, *Smith v. Comm'r of Soc. Sec.*, 2013 WL 5316766, at *3 (N.D. Ohio) (finding ALJ not required to consider the testimony of claimant's mother).

In sum, the Court finds consideration of sympathy and subjective complaints to be within the ALJ's purview in assigning weight to opinion evidence of record. It follows that consideration of these factors did not deny Plaintiff a full and fair hearing. Accordingly, Plaintiff's argument is without merit.

### RFC Determination

Next, Plaintiff argues the ALJ improperly omitted limitations in standing and walking caused by fissuring on the plantar surface of both of Plaintiff's feet. (Doc. 17, at 21).

A claimant's RFC is an assessment of "the most [s]he can still do despite [her]

25

limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.*, at § 416.929. An ALJ must also consider and weigh medical opinions. *Id.*, at § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. The Court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

In this case, Plaintiff claimed psoriasis on her feet caused painful, deep fissures which were prone to infection and limited her ability such that she could stand for only forty-five minutes and walk for up to half a mile. (Tr. 18-19).

However, the ALJ declined to find any severe impairment in Plaintiff's feet because she first reported the fissures in May 2011 and did not report the fissures to her primary care provider until September of 2011. (Tr. 15, 663-66, 683). Furthermore, Plaintiff was not referred to a dermatologist until December of 2011 and has only been prescribed daily lotion for her symptoms. (Tr. 15, 697-99). Additionally, the ALJ recalled Plaintiff reported to Dr. Hall that she suffered from foot pain but had not reported the condition to her physician. (Tr. 21, 663). Dr. Hall's physical examination of Plaintiff revealed normal gait, diffuse tenderness of the feet with fissures, some reduced lumbar range of motion, and moderate difficulty walking on heels and toes – findings that contradict Plaintiff's allegations of debilitating pain. (Tr. 21, 664-65). The ALJ also commented on Dr. Klyop's finding that Plaintiff could perform medium exertional work with frequent postural activities. (Tr. 23, 124-26, 129-30). Further, as stated above, the ALJ provided good reasons for affording little weigh to Dr. Hall's restrictive walking and standing limitations. The ALJ also considered Plaintiff's activities of daily living, including her ability to

care for two children with little assistance, maintain personal care, perform housekeeping tasks, spend time with family and friends, and cook. (Tr. 21-22, 54-56, 58-59, 676).

For these reasons, the ALJ's decision to limit Plaintiff to medium work in the RFC determination is supported by substantial evidence.

*Step Five*

Last, Plaintiff claims the ALJ improperly relied on VE testimony that conflicted with the DOT, hypothetical, and/or nonexistent jobs. (Doc. 17, at 22). The Commissioner concedes the ALJ should not have relied on the position of cleaner but maintains the remaining positions of self-service laundry attendant and drying oven attendant amount to substantial evidence to support the ALJ's step five determination. (Doc. 18, at 23). In response, Plaintiff argues with half of the jobs the ALJ considered eliminated with the position of cleaner, there is no longer a significant number of jobs, especially considering the fact that "[m]anufacture of felt hats from animal pelts in the U.S. is not a reliably-cited job." (Doc. 19, at 10).

At step five, the Commissioner has the burden to show, considering a claimant's age, education, and work experience, that jobs exist in significant numbers in the national economy which claimant can perform. 20 C.F.R. § 416.969; *Hall v. Bowen*, 837 F.2d 272, 272 (6th Cir. 1988). Under the Regulations, "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. § 416.966(a). There is no bright-line boundary separating a "significant number" from an insignificant numbers of jobs. *Hall*, 837 F.2d at 275 (6th Cir. 1988).

A reviewing court should "consider many criteria in determining whether work exists in significant numbers" including "the level of the claimant's disability[,] the reliability of the [VE's] testimony[,] the reliability of the claimant's testimony[,] the distance claimant is capable

of travelling to engage in the assigned work[,] the isolated nature of the jobs[,] the types and availability of such work, and so on." *Id*. Here, based on Plaintiff's age, education, work experience, and RFC, the ALJ determined that for the positions of self-service laundry attendant and drying attendant, there are a combined 85,000 jobs nationally and 1,700 jobs regionally. (Tr. 75).

In this case, the *Hall* factors weigh against Plaintiff's argument. First, the ALJ's RFC determination limiting Plaintiff to a range of medium work is supported by substantial evidence, as explained above. Moreover, the ALJ's adverse credibility determination stands unchallenged. (Tr. 19). At the hearing, the VE said her testimony was consistent with the DOT (except it does not account for a sit/stand option) and was based on her knowledge of "the world of work, the [DOT], and [her] general experience." (Tr. 78). Although Plaintiff's attorney questioned the VE about how her testimony would hold up in light of different hypotheticals, he did not object to any of the positions identified by the VE nor did he identify any conflict between the relevant positions and the DOT. (Tr. 78-79). While Plaintiff challenges the drying oven attendant position, he has provided no evidence to refute the VE's expert testimony. Finally, although Plaintiff did not have a license because she does not carry insurance, she was able to drive and has not alleged significant difficulty traveling due to her alleged impairments. (Tr. 42-43). In short, the ALJ's step five determination is supported by substantial evidence.

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge